**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SEAN TWOMEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ACE HARDWARE CORPORATION, ACE RETAIL HOLDINGS LLC, ACE RETAIL GROUP, INC., and EPICOR SOFTWARE CORPORATION,<br><br>Defendants. | Case No. 1:26-cv-5320<br><br>District Judge Sunil R. Harjani |

# MEMORANDUM IN SUPPORT OF DEFENDANT EPICOR SOFTWARE CORPORATION'S MOTION TO DISMISS


Gary Feinerman (ARDC No. 6206906)
LATHAM & WATKINS LLP
330 N Wabash Ave, Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
gary.feinerman@lw.com

Lawrence E. Buterman (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: 212.906.1200
lawrence.buterman@lw.com

Marguerite Sullivan
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: 202.637.2200
marguerite.sullivan@lw.com

Ashley M. Bauer (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: 415.391.0600
ashley.bauer@lw.com

*Attorneys for Defendant Epicor Software Corporation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....... 1

FACTUAL ALLEGATIONS ....... 1

LEGAL STANDARD ....... 3

ARGUMENT ....... 3

I. Plaintiff Does Not Allege That Epicor Knew Of Any Conspiracy Among The ACE Defendants Or ACE Stores ....... 4

II. Plaintiff Does Not Allege That Epicor Intended To Join The Purported Conspiracy To Restrain Trade ....... 6

III. Plaintiff Does Not Allege That Epicor Made A Material Contribution To The Supposed Conspiracy ....... 7

CONCLUSION ....... 10

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 3

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) ..... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 3, 4

*Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*,
46 F.4th 535 (7th Cir. 2022) ..... 2

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003) ..... 6

*In re Brand Name Prescription Drugs Antitrust Litig.*,
288 F.3d 1028 (7th Cir. 2002) ..... 4, 5

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ..... 4

*In re Loc. TV Advert. Antitrust Litig.*,
2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ..... 8

*Kondilis v. City of Chicago*,
160 F.4th 866 (7th Cir. 2025) ..... 2

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ..... 4

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ..... 4

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ..... 4, 6, 7

*Toys "R" Us, Inc. v. F.T.C.*,
221 F.3d 928 (7th Cir. 2000) ..... 6

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ..... 5

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ..... 6

## INTRODUCTION

Plaintiff attempts to allege a conspiracy between Defendant Ace Hardware Corporation ("AHC") and Ace Member Stores ("Ace Stores") to fix prices and share data, in which Defendant Epicor Software Corporation ("Epicor") allegedly participates by "provid[ing] the technological tools essential to the conspiracy's success." Compl. ¶ 4. The Complaint does not plausibly allege a conspiracy among any of the Defendants,[1] and Epicor's alleged role is particularly ill-pleaded and implausible. As the Complaint makes plain, Epicor is no more than an enterprise-resource-planning ("ERP") and point-of-sale ("POS") software provider. Its products are not algorithmic, and neither they nor Epicor recommend or determine prices.

Legally, there is no support for maintaining a claim against a company merely because its product was used in connection with an alleged antitrust conspiracy. Were it otherwise, companies across the world that provide business tools—from software, to shipping, to communications—would be subject to litigation in antitrust conspiracy cases. Here, Plaintiff's attempt to rope in Epicor is particularly flawed, as the Complaint fails to describe any wrongful conduct, let alone by Epicor. Basic details about when, how, where, and why Epicor joined the so-called conspiracy with AHC, Ace Retail Holdings LLC, and/or Ace Retail Group, Inc. are notably absent. Indeed, the Complaint does not allege that Epicor even knew of, let alone intended to join or materially contributed to, the purported conspiracy. The Complaint's silence on these critical points is fatal to Plaintiff's claims against Epicor, warranting its dismissal.

## FACTUAL ALLEGATIONS[2]

Epicor is a provider of ERP and POS software. Compl. ¶ 16. Epicor's offerings include

---

[1] This memorandum raises grounds for Epicor's dismissal in addition to those set forth in the Memorandum in Support of Defendants' Joint Motion to Dismiss the Complaint. ECF 39.

[2] For purposes of this motion only, Epicor assumes the truth of Plaintiff's factual allegations.

products that provide "on-demand analysis of customer behavior, inventory movement, and sales history." *Id*. One such product is Epicor Eagle for Windows ERP ("Eagle"), which is an "in-store technology solution" that has "POS, inventory management, accounts receivable, accounts payable, general ledger and reporting capabilities." *Id*. ¶¶ 68, 69 n.91. Epicor sells Eagle software to Ace Stores through a partnership with AHC. *Id.* ¶¶ 16, 68. Eagle "integrat[es] with ACENET," Ace's intranet, and with Mango Report, an AHC inventory software. *Id*. ¶¶ 68, 76.[3] A majority, but not all, of Ace Stores use Eagle software. *Id*. ¶¶ 16, 69.

Eagle collects standard POS data "about the prices Ace Member Stores charge for each of their products, the quantities they are selling, and their inventory." *Id*. ¶ 5. Eagle then "transmit[s]" or "deliver[s]" to AHC transaction data regarding completed sales from each Ace Store that participates in the Ace Rewards Program. *Id*. ¶¶ 16, 67, 69. The Complaint does not allege that Epicor shares this data from one Ace Store to another.

The Complaint alleges that AHC uses Eagle to send pricing information—including Price Levels, weekly pricing "hotsheets," and "Critical Price Change" alerts—to Ace Stores. *Id.* ¶¶ 16,

---

[3] Mango Report is an AHC inventory management tool, not a pricing tool. *See* https://mydigimag.rrd.com/publication/?i=814521&p=12&view=issueViewer (cited in Compl. ¶ 70 n.96). It is used for "Inventory Accuracy, Shrink Control, Exception Reporting, Closeout Management, In Stock Tuning, Assortment Reporting, Back Stock Replenishment," and "Show Buying Report." *Id*. ¶ 70 n.97; Ex. A (Mango 2025 Report Packet) at 1. Ace Stores can pull "count sheets" "directly from Mango systems" into a "Physical Inventory Posting" in Eagle. Compl. ¶ 76 n.105, Ex. B (Ace Mango Integration) at 1. This is not pricing data.

These two exhibits, like the others attached to this motion, are cited in the Complaint and purport to provide key support for many of its factual allegations, particularly the function of Epicor's software. The exhibits are therefore incorporated by reference and should be considered in resolving this motion. *See Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 543 (7th Cir. 2022) ("A district court may consider documents attached to a motion to dismiss if the documents are referenced in the plaintiffs' complaint and are central to the claim."); *Kondilis v. City of Chicago*, 160 F.4th 866, 869 (7th Cir. 2025) (noting courts may consider documents "referenced in the complaint and central to the claim").

89-90.[4] The Complaint does not allege that Epicor's software is algorithmic, meaning that Epicor does not analyze or synthesize the Ace data for any purpose; rather, it merely transmits the data. It is AHC—not Epicor—that allegedly uses the data to develop and issue pricing recommendations to Ace Stores. *Id.* ¶¶ 60, 67, 83. Each individual Ace Store chooses its own pricing. *Id.* ¶¶ 27, 30, 61, 78. Ace Stores retain discretion to "assign more competitive pricing to selected items" while "maintain[ing] higher margins on other items." *Id.* ¶ 92. And each Ace Store may opt to change its pricing in response to a Critical Price Change alert or not. *Id.* ¶ 80.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "[L]abels and conclusions" are insufficient, as are "naked assertion[s] devoid of further factual enhancement." *Id.* (citation omitted).

## ARGUMENT

A viable Sherman Act Section 1 claim "requires a complaint with enough factual matter … to suggest that an agreement [in restraint of trade] was made." *Twombly*, 550 U.S. at 556. A plaintiff must allege that the defendant "(1) entered into an agreement that (2) unreasonably

---

[4] The Complaint alleges that Epicor "issue[s]" the Critical Price Change alerts, but the very source it cites makes clear that (i) AHC analyzes Ace Store pricing and issues the alert and (ii) Epicor Eagle merely delivers the message. Compl. ¶ 79 n.114; Ex. C (Ace Level Pricing) at 2 ("Ace analyzes store-level pricing to identify SKUs that are priced less than RSC cost, below Ace retail, or are in violation of a MAPP retail. After these SKUs are reviewed and submitted in Ace's Retail Analytics Dashboard, [the Ace Store] can then review the critical price changes in the Eagle Item Price Change (IPC) viewer."). "To the extent that an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the exhibit takes precedence." *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1210 (7th Cir. 2013).

restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 349 (7th Cir. 2022). To plead the requisite agreement in an antitrust conspiracy, the complaint must allege that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). To clear that hurdle, it is "essential to show" that the defendant in question joined the alleged conspiracy and knew of its scope. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 803 (N.D. Ill. 2017).

The Seventh Circuit employs a three-factor test to determine whether a plaintiff has adequately pleaded a horizontal conspiracy claim against a vertical supplier like Epicor: the defendant (1) "knew [the horizontal conspirators] intended to restrain trade;" (2) "intended that trade be restrained;" and (3) "materially contributed to that restraint." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 497 (7th Cir. 2002); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1033-35 (7th Cir. 2002) (vertical supplier must have known price discrimination was collusive, and then agreed to support that price discrimination, to create liability). Plaintiff fails to sufficiently plead any of the three elements, warranting dismissal.

## I. PLAINTIFF DOES NOT ALLEGE THAT EPICOR KNEW OF ANY CONSPIRACY AMONG THE ACE DEFENDANTS OR ACE STORES

The Complaint does not plausibly allege that Epicor knew of a horizontal price-fixing conspiracy among the Ace Stores. The closest Plaintiff gets is Paragraph 68, which asserts that Epicor "knowingly developed, sold, and maintained the software that runs the Ace Cooperative's data collection, dissemination, and price coordination efforts." Compl. ¶ 68. Knowingly developing, selling, and providing technical assistance for or maintaining software for a client, does not equate to knowledge that the client was involved in a conspiracy intended to restrain trade. As the Seventh Circuit has held, knowledge of a conspiracy cannot be inferred. *In re Brand*

*Name Prescription Drugs*, 288 F.3d at 1033 (to infer knowledge "would amount to basing an inference of conspiracy on negligence"). If the law were otherwise, the creator of any banking application used for payments among fraudsters would likewise have knowledge of the conspiracy. That clearly is not the case. *Cf. Twitter, Inc. v. Taamneh*, 598 U.S. 471, 503 (2023) (in affirming dismissal of substantial assistance complaint against Twitter, noting that "a contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them").

The Complaint does not plausibly allege, as it must, that Epicor, by providing software and related support services, knew of any common scheme to restrain trade. Plaintiff's conclusory allegation that "Epicor is familiar with the details of Level Pricing" because it has an online help page for Ace Hardware does not show knowledge of the alleged conspiracy. Compl. ¶¶ 90-91. After all, Ace Stores have not agreed to be bound by AHC's Price Level recommendations, so familiarity with Level Prices is consistent with unilateral pricing and does not suggest any conspiracy at all. *See id*. ¶¶ 27, 30, 61, 78; Ex. D (AHC 2025 Annual Report) at 70 ("While [AHC] can assist you [the Ace Store] with recommended product assortment and pricing, you [the Ace Store] assume responsibility for all aspects of your store's product assortment and pricing.").

Nor does Plaintiff's allegation that Epicor "was aware … that its software [was] used" with AHC's Mango Report software, Compl. ¶ 76, suffice to plead Epicor's knowledge. The Complaint alleges only Epicor's generalized awareness of the Mango Reports. *Id.* There is no allegation that Epicor even received copies of AHC's Mango Reports, let alone that Epicor directly participated in creating them. *E.g.*, *id*. ¶¶ 72-75. In fact, the Complaint alleges that AHC owns the Mango Report and that Epicor's software merely "integrate[s] with" the software, which—as made clear by the very document the Complaint cites for this proposition—means pulling inventory "count

sheets" from Mango systems to the store's computer terminal, eliminating the need for the store to individually type in each item. *Id.* ¶ 76 & n.105; Ex. B (Ace Mango Integration) at 1; *see also id.* ¶ 70 n.97 (marketing material for Mango Report, including a sample count sheet). Inventory count sheets have nothing to do with pricing, so this capability does not plausibly suggest a conspiracy involving Epicor, let alone that Epicor had knowledge of the alleged conspiracy.

## II. PLAINTIFF DOES NOT ALLEGE THAT EPICOR INTENDED TO JOIN THE PURPORTED CONSPIRACY TO RESTRAIN TRADE

Even if the Complaint plausibly alleged that Epicor has *knowledge* of the supposed conspiracy (it does not), it fails to plausibly allege that Epicor *intended* to join a horizontal conspiracy to restrain trade. The Complaint alleges that Epicor and AHC are the hub of a conspiracy of which the Ace Stores are the spokes. Compl. ¶ 193. As explained in Defendants' Joint Motion to Dismiss, the Complaint fails to state a conspiracy because it lacks any allegation of a "rim" (or agreement) between the horizontal Ace Stores. ECF # 39 at 13.

Because Epicor is a vertical seller to the Ace Stores, Compl. ¶¶ 16, 68, to plausibly allege that Epicor was a "hub" of a conspiracy, Plaintiff must allege (i) communications by Epicor assuring the spokes (Ace Stores) that other spokes were also participating in restrictive contracts or (ii) some coordination by the hub of communication among the spokes. *See Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (hub-and-spoke conspiracy present where vertical supplier "tr[ied] to disadvantage the warehouse clubs, its competitors, by coercing suppliers to deny the clubs the products they needed"); *United States v. Apple, Inc.*, 791 F.3d 290, 316 (2d Cir. 2015) (because "Apple consciously orchestrated a conspiracy among the Publisher Defendants," it was "more than an innocent bystander"). There are no such facts alleged here, which means that the Complaint does not plausibly allege Epicor's "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764; *cf. Doe v. GTE Corp.*, 347

F.3d 655, 659 (7th Cir. 2003) (in affirming dismissal of complaint against web hosting service that hosted illegal website, noting that "[e]ven entities that know the information's content do not become liable for the sponsor's deeds" given that the law "requires a desire to promote the wrongful venture's success" for liability).

Nor does the Complaint plausibly allege that Epicor intended to restrain trade. The Complaint does not allege that Epicor provided software to AHC and Ace Stores with an intent to join the supposed conspiracy or to fix prices. At most, Plaintiff alleges that Epicor advertises software integration with other Ace software (such as AHC's Mango Report) and that Eagle transmits "hotsheets" and Critical Price Changes from AHC to Ace Stores. Compl. ¶¶ 16, 76, 90. That does not plausibly suggest that Epicor *intended* to join a conspiracy to restrain trade—there are no allegations that Epicor profits or benefits in any way from the purported price-fixing conspiracy and resulting alleged price increases, only allegations that AHC is a long-standing "partner[]" of Epicor. *Id.* ¶ 69. Nor does it come close to suggesting a conscious commitment to engage in a common unlawful scheme. *See Monsanto*, 465 U.S. at 764 ("There must be evidence that tends to exclude the possibility that [the alleged conspirators] were acting independently.").

## III. PLAINTIFF DOES NOT ALLEGE THAT EPICOR MADE A MATERIAL CONTRIBUTION TO THE SUPPOSED CONSPIRACY

Even if it sufficiently pleaded Epicor's knowledge and intent, the Complaint still fails to state a claim against Epicor because it does not plausibly allege that Epicor contributed materially to the purported scheme. The only potential "contribution" Epicor is alleged to have made is its POS software and technical support, which allegedly "facilitate[d]" the supposed price-fixing conspiracy. Compl. ¶ 68. Plaintiff claims that the Eagle software "facilitated" price fixing by: (1) transmitting "Critical Price Change" alerts or "hotsheets" from AHC to Ace Stores; (2) integrating with AHC's Mango Report; and (3) transmitting real-time sales data. *Id.* ¶¶ 16, 71, 76 n.105, 89-

90, 191. These allegations are fatally inconsistent with the documents the Complaint cites in support—documents that make clear that the Eagle software has not facilitated, or materially contributed to in any way, any alleged conspiracy.

*Critical Price Change & Hotsheets*: The Complaint alleges that "online documentation for Eagle" shows that Ace Stores use Eagle "to receive 'Critical Price Change' alerts," *id*. ¶ 16, and "hotsheets," *id*. ¶ 90. But this "online documentation" is nothing more than a help page that instructs Eagle users how to import information from AHC into each user's own system. *Id*. ¶¶ 79-80, 90-91 & n.121; Ex. C (Ace Level Pricing) at 1. For example, to activate the "Level Pricing" transmission, the help page states: "Level Pricing is researched and developed by Ace's Category Management team, which is part of Merchandising." Compl. ¶ 90 n.121; Ex. C at 1. The first step is to "[c]all Ace Retail Technology Support," and the next steps involve technical explanations of how to use the software to pull information from the Ace-authored "hotsheet." Compl. ¶ 90 n.121; Ex. C at 1. From there, each Ace Store chooses its own Price Levels. Compl. ¶¶ 27, 61, 78. The approach for Critical Price Changes is similar: "Ace builds a list of suggested price changes," and the user must take specific steps to import AHC's list. *Id.* ¶ 79 n.114; Ex. C at 2. An Ace Store may opt to change its pricing in response to a Critical Price Change alert or not. Compl. ¶ 80.

The Eagle system does not offer Critical Price Change alerts and hotsheets until the user enables them. *Id.* ¶ 79 n.114; Ex. C at 1-2 (Ace Level Pricing page explaining that the user must go to "Options Configuration" to set up this program, and Ace Critical Price Changes page explaining that the user must accept "Critical Price Changes" on AceNet to set up this program). AHC could have mailed or emailed the same information to Ace Stores for uploading to their POS systems; all the Eagle software allegedly does is transmit the information. That is not a material contribution to an antitrust conspiracy. *See In re Loc. TV Advert. Antitrust Litig.*, 2022 WL

3716202, at *8 (N.D. Ill. Aug. 29, 2022) (dismissing conspiracy claim against defendant whose alleged role was limited to transmitting "market reports and recommendations").

*Mango Report:* The Complaint alleges that the "Ace Member Stores share up-to-date price and output data" through AHC's Mango Report software, which allegedly receives daily data feeds through Epicor Eagle. Compl. ¶¶ 70-71, 76 & n.104; Ex. E (Program Overview). But the source for the integration allegation merely states that "Eagle can now pull *count sheets* directly from Mango systems and load them into *Physical Inventory Posting* (PIP) screen." Compl. ¶ 76 n.105 (emphasis added); Ex. B at 1. A help page related to taking physical inventory does not support the conclusory allegation that Eagle transmits pricing information *between* the Ace Stores daily or that *Epicor* (rather than AHC) "take[s] Member Stores' real-time competitively sensitive information, including price and sales data, and turn[s] it into a monthly report on a variety of issues related to inventory and pricing." Compl. ¶ 71.

*Real-Time Sales*: The Complaint alleges that Eagle software allows "the Cooperative"[5] "to view and track retail sales data in real-time intervals[.]" *Id.* ¶ 77 & n.107. But, as the document Plaintiff cites for that point explains, the data goes from each store to AHC so that the wholesaler can "have a corporate-wide view of [its] inventory status." *Id.* ¶ 77 n.107; Ex. F (Perle Press Release) at 2. Plaintiff does not allege that Epicor sends real-time sales data *among* Ace Stores. Instead, it refers to real-time sales data transfers among "the Cooperative," a catchall that obscures that the data transfer is actually between each Ace Store and AHC. Compl. ¶ 77.

The Complaint does not plausibly allege that any of Epicor's alleged conduct materially contributed to the alleged conspiracy, providing a third ground for dismissing Epicor.

---

[5] "The Cooperative" is defined as AHC and its "Member Stores." Compl. ¶ 4.

## CONCLUSION

Epicor respectfully requests that the Court dismiss the Complaint.

Dated: August 3, 2026

Respectfully submitted,

*/s/ Gary Feinerman*

Gary Feinerman (ARDC No. 6206906)
LATHAM & WATKINS LLP
330 N Wabash Ave, Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
gary.feinerman@lw.com

Lawrence E. Buterman (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: 212.906.1200
lawrence.buterman@lw.com

Marguerite Sullivan
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: 202.637.2200
marguerite.sullivan@lw.com

Ashley M. Bauer (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: 415.391.0600
ashley.bauer@lw.com

*Attorneys for Defendant Epicor Software Corporation*