**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SEAN TWOMEY; WILLIAM CRIM; GREGORY ERNST; JASON GOODIN; and ADAM KLEEKAMP, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ACE HARDWARE CORPORATION; ACE RETAIL HOLDINGS LLC; ACE RETAIL GROUP, INC.; EPICOR SOFTWARE CORPORATION; ACE HARDWARE OF CHATTANOOGA, INC.; BELLMORE HOME CENTER, INC. (d/b/a "COSTELLO'S ACE HARDWARE"); BOLSTER HARDWARE LLC; THE HELPFUL HARDWARE COMPANY, LLC; THE HELPFUL GROUP, LLC; NIEMANN FOODS, INC.; W.E. AUBUCHON CO., INC.; and WHITMORE INVESTMENTS, INC.,

Defendants.

Case No. 1:26-cv-05320

Honorable Sunil R. Harjani

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**


Table of Contents ..... i

Table of Authorities ..... ii

Overview ..... 1

Factual Allegations ..... 4

Legal Standard ..... 9

Argument ..... 10

I. The Complaint Does Not Plead a Price-Fixing Agreement (Cause of Action I) ..... 10

A. There Is No Direct Evidence of Agreement ..... 10

B. There Is No Indirect or Circumstantial Evidence of a Conspiracy ..... 11

C. There Are Obvious Alternative Explanations for Price Increases ..... 15

D. There Is No Plausibly Alleged Hub-and-Spoke Conspiracy ..... 17

II. The Complaint Fails to Plead Actionable Market Allocation (Cause of Action II) ..... 19

A. AHC's Alleged Site Selection Process Is Not an Agreement to Divide Territories ..... 19

B. There Is No Plausible Horizontal Agreement to Divide Territory ..... 21

III. There Is No Plausibly Alleged Relevant Market (Causes of Action I, II, III) ..... 21

A. The Complaint Fails to Plead a Plausible Relevant Product Market ..... 22

B. The Complaint Fails to Plead a Plausible Relevant Geographic Market ..... 24

C. The Local Examples Do Not Allege Antitrust Markets ..... 28

IV. The Information Provided to Ace Stores Does Not Support an Antitrust Information Exchange Claim (Cause of Action III) ..... 30

V. The Alleged Agreements Are Lawful Under the Rule of Reason (Causes of Action I, II, III) ..... 32

A. The Complaint Does Not Plausibly Plead Market Power ..... 34

B. The Complaint Does Not Plausibly Allege Anticompetitive Effects ..... 35

C. The Complaint's Alternative "Quick Look" Standard Also Fails ..... 38

Conclusion ..... 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*42nd Parallel North v. E St. Denim Co.*,
286 F.3d 401 (7th Cir. 2002) ....................24, 25, 27, 29

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012)....................21, 32, 34

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*,
930 F.3d 812 (7th Cir. 2019).................... 38

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
2 F.4th 695 (7th Cir. 2021)....................10, 11

*Am. Needle, Inc. v. New Orleans Louisiana Saints*,
385 F. Supp. 2d 687 (N.D. Ill. 2005) ....................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................9, 17, 22, 36

*Ass'n of Am. Physicians & Surgeons v. Am. Bd. of Med. Specialties*,
15 F.4th 831 (7th Cir. 2021)....................9, 11

*Ass'n of Am. Physicians & Surgeons v. Am. Bd. of Med. Specialties*,
2020 WL 5642941 (N.D. Ill. Sept. 22, 2020) ....................10

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013)....................10, 11

*Bathke v. Casey's Gen. Stores*,
64 F.3d 340 (8th Cir. 1995)....................25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................... *passim*

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012)....................36

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999) ....................38

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984)....................2, 26, 28, 33

*Chicago Pro Sports LP v. NBA*,
95 F.3d 593 (7th Cir. 1996)....................17, 34

*Gibson v. MGM Resorts Int'l*,
2023 WL 7025996 (D. Nev. Oct. 24, 2023) ....................13, 14

*Hyland v. HomeServices of Am., Inc.*,
771 F.3d 310 (6th Cir. 2014)....................38

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)....................14

*In re Broiler Chicken Antitrust Litig.*,
702 F. Supp. 3d 635 (N.D. Ill. 2023) ....................31

*In re Fico Antitrust Litig. Related Cases*,
2023 WL 6388247 (N.D. Ill. Sept. 28, 2023) ....................17

*In re Loc. TV Advert. Antitrust Litig.*,
2022 WL 3716202 (N.D. Ill. Aug. 29, 2022)....................30, 31, 34

*In re Manufactured Home Lot Rents Antitrust Litig.*,
2025 WL 3485693 (N.D. Ill. Dec. 4, 2025).................... *passim*

*In re Multiplan Health Ins. Provider Litig.*,
789 F. Supp. 3d 614 (N.D. Ill. 2025) ....................21, 31

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
767 F. Supp. 3d 681 (N.D. Ohio 2025)....................12, 13, 15

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
2026 WL 879018 (N.D. Ohio Mar. 31, 2026) ....................16

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023) ....................27, 31

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014)....................32, 33

*In re Turkey Antitrust Litig.*,
2026 WL 1960792 (N.D. Ill. July 7, 2026)....................13, 19, 32

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
2013 WL 4599903 (N.D. Ill. Aug. 29, 2013)....................22

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ....................37

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022)....................10

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020)....................17, 18, 19

*Maui Jim, Inc. v. SmartBuy Guru Enters.*,
386 F. Supp. 3d 926 (N.D. Ill. 2019)....................22, 23, 24

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)....................10

*NCAA v. Bd. of Regents of U. of Okla.*,
468 U.S. 85 (1984)....................38

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
472 U.S. 284 (1985)....................37

*Nucap Indus., Inc. v. Robert Bosch LLC*,
273 F. Supp. 3d 986 (N.D. Ill. 2017)....................22

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)....................26, 32, 34, 36, 38

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990)....................19, 37

*Phillips v. Prudential Ins. Co. of Am.*,
714 F.3d 1017 (7th Cir. 2013)....................4

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
776 F.2d 185 (7th Cir. 1985)....................21, 37

*Prosterman v. Am. Airlines, Inc.*,
747 F. App'x 458 (9th Cir. 2018)....................12

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
412 F. Supp. 3d 941 (N.D. Ill. 2019)....................22

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
971 F.2d 37 (7th Cir. 1992)....................36

*Segal v. Amadeus IT Grp., S.A.*,
2025 WL 963751 (N.D. Ill. Mar. 31, 2025)....................18, 30

*Segal v. Amadeus IT Grp., S.A.*,
2026 WL 879583 (N.D. Ill. Mar. 31, 2026)....................30

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
950 F.3d 911 (7th Cir. 2020)....................25, 29, 30, 34, 35

*Siva v. Am. Bd. of Radiology*,
418 F. Supp. 3d 264 (N.D. Ill. 2019) ....................22

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................31

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008)....................17

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000)....................34

*United States ex rel. Blaum v. Triad Isotopes, Inc.*,
104 F. Supp. 3d 901 (N.D. Ill. 2015)....................35

*United States v. Citizens & S. Nat'l Bank*,
422 U.S. 86 (1975) ....................34

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ....................22

*United States v. Topco Associates*,
405 U.S. 596 (1972) ....................19, 21

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978) ....................31, 36

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018)....................12, 15

## Overview

Ace Hardware Corporation ("AHC")[1] is a retailer-owned cooperative that helps independent hardware stores compete vigorously against major competitors like Home Depot, Lowe's, and many other well-known brands across a wide range of product lines. The Amended Class Action Complaint (ECF 44)[2] ("Complaint") posits, however, that Ace and roughly 5,000 independent Ace stores nationwide conspired to fix prices across all of their many product lines using Epicor's software. The Complaint asks the Court to accept the implausible notion that Ace stores stand in a market by themselves in which they only compete with other Ace stores and no one else. The case thus would proceed on the unsustainable theory that each Ace store is in essence a single-brand product market in a series of thousands of implausibly narrow, circular, and overlapping geographic markets across the country. But the alleged facts and bedrock antitrust principles do not support that theory. The Complaint not only proposes absurd markets, but also wrongly labels lawful and competition-enhancing cooperative services (pricing tools, benchmarking reports, software support, and store-location review) as naked price fixing, market allocation, and anticompetitive information exchange.

The Complaint is brought on behalf of five plaintiffs against AHC and two of its subsidiaries, eight independent retail store owners, and Epicor. Plaintiffs amended their Complaint after Defendants filed a motion to dismiss that raised many of these same grounds. The Complaint fails to state any claim against any Defendant.

---

[1] Ace Retail Group, Inc. is wholly owned by Ace Retail Holdings LLC, which is a wholly owned subsidiary of AHC. "Ace" refers collectively to all three defendants unless otherwise stated.

[2] Plaintiff filed a Class Action Complaint on May 7, 2026. (ECF 1.) After Ace moved to compel arbitration (ECF 35) and Defendants moved to dismiss the Class Action Complaint (ECF 38–39, 41), Plaintiffs filed an Amended Class Action Complaint (ECF 44), which adds new named Plaintiffs and Defendants, and a few additional factual allegations, but does not address the failures identified in Defendants' motions to dismiss.

Antitrust complaints must plead facts that make a conspiracy *plausible*. This one does not.

➢ **The Complaint fails to plead a conspiracy under Section 1 of the Sherman Act (Cause of Action I).** The Complaint does not plausibly suggest a horizontal agreement among competitors. Nor does it plausibly suggest that vertical software supply agreements between Epicor and Ace stores constitute an unlawful "hub-and-spoke" conspiracy. It pleads no facts suggesting that any Ace stores (or spokes) entered into an agreement with Epicor only on the condition that all of the other stores also would. It does not plead the "rim" required for plausibility.

➢ **The Complaint fails to plead a plausible market allocation claim (Cause of Action II).** None of the 5,000+ Ace stores allegedly received an exclusive territory. The Complaint provides no map of territories, no promise by one store to stay out of another's territory, and no right to exclude any other store from an area. It challenges ordinary store-location review in a cooperative system that added hundreds of stores annually—expanding, not restricting, entry.

➢ **The Complaint fails to allege a plausible conspiracy to share pricing information (Cause of Action III).** Information sharing is not inherently anticompetitive and can be procompetitive. The information allegedly shared here was anonymized and backward-looking and thus cannot predicate a viable conspiracy claim.

➢ **The Complaint fails to plead a plausible product market (Causes of Action I, II, & III).** District courts need not "don blinders" or "ignore commercial reality" when considering the plausibility of antitrust complaints. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984), *abrogated on other grounds by Schmees v. HC1.COM, Inc.*, 77 F.4th 483 (7th Cir. 2023). The Complaint fabricates the concept of a "convenience hardware market" that consists mostly of just Ace stores—and in which Ace stores never compete for customers

against the likes of Home Depot, Lowe's, Amazon, Walmart, Target, Costco, Menards, or anyone but local small hardware stores. No plausible antitrust complaint can proceed on the theory that a customer shopping for items like paint, mulch, tools, batteries, grills, and many household items would view Ace (and sometimes Do it Best, a competitor chain) as the only option. The Complaint and the materials it incorporates identify *many* other vigorous competitors.

- **The Complaint fails to plead plausible geographic markets (Causes of Action I, II, & III).** The Complaint posits that each Ace store sits at the center of a relevant geographic market with a 15-minute driving radius. It thus proposes 5,000+ overlapping circular geographic markets across the United States—a tangled hodgepodge of Venn diagrams—far from a principled antitrust market. The Complaint also offers two equally meritless fallback markets.

- **All alleged agreements should be evaluated under the Rule of Reason (Causes of Action I, II, & III).** This memorandum is organized in a logical sequence that first addresses the *per se* framework and then the Rule of Reason. But briefing structure aside, the law is settled that the Rule of Reason is the presumptive standard for antitrust matters. The nature of this Complaint leaves no doubt that this is a Rule of Reason case, and that the Complaint fails to state a claim under the Rule of Reason. The alleged restraints are largely vertical, promote interbrand competition (which antitrust laws favor), and are, at most, ancillary to procompetitive ventures.

- **The Complaint does not plausibly plead market power or anticompetitive effects (Causes of Action I, II, & III).** The Complaint's manufactured 15-minute markets often lead to contrived market "power" for one Ace store in a one-store and one-brand market, within each of those myriad overlapping 15-minute circles, artificially excluding real competitors.

- **The Complaint is a transparent attempt to circumvent arbitration.** On August 3, 2026**,** Ace moved to compel arbitration (ECF 35) on the ground that Plaintiff Twomey's

purchases were made with an Ace Rewards account, thereby subjecting his claims to arbitration. The Complaint now reframes Twomey as a non-member of Ace Rewards (¶ 18) and adds two more non-member Plaintiffs. (¶¶ 21–22.) The Complaint also adds two Plaintiffs who are Ace Rewards members but omits Ace as a defendant to their claims. (¶¶ 19–20.) This effort to avoid that arbitration agreement does nothing to address the numerous substantive failings of Plaintiffs' claims.

## Factual Allegations[3]

**The Parties:** AHC has been a retailer-owned cooperative since 1973. (¶ 51.)[4] Its origins date to the 1920s, when retailers cooperated to buy directly from manufacturers, lower inventory costs, and "compete more effectively with [] larger stores[.]" (Ex. A, AHC 2025 Annual Report ("2025 Report") at 6.) AHC offers its 5,000+ retail store members ("Ace stores") "a full line of hardware products including grills [], hand and power tools, plumbing and heating supplies, lawn and garden equipment, electrical supplies, housewares and small appliances, and general merchandise such as paint, cleaning and related products." (*Id.* at 10.) The Complaint also names eight entities that own Ace stores (the "Ace Store Defendants"). (¶¶ 27–35.) No Plaintiff alleges a purchase from any Ace Store Defendant, yet every Plaintiff sues the Ace Store Defendants. (¶¶ 18–22.)

Epicor provides point-of-sale software to retailers. (¶ 16.) Many (but not all) Ace stores use its "Eagle" software. (¶¶ 16, 36, 83.)

---

[3] For purposes of this motion only, Defendants assume the truth of Plaintiffs' factual allegations.

[4] Citations in parentheses to paragraphs and footnotes refer to the Complaint, ECF 44, or documents cited therein, which are attached as Exhibits A–K. Courts "must consider not only 'the complaint itself,'" but also attached documents "that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). All emphasis in citations is added unless stated.

Plaintiffs are five consumers who bought from seven Ace stores in Illinois, Colorado, and Missouri. (¶¶ 18–22.) Six of those stores are not parties. (¶¶ 18–21, 38.) The seventh is a Westlake store owned by Ace Retail Group. (¶ 22.) Crim and Ernst sue only Epicor and the Ace Store Defendants. (¶¶ 19–20.) Twomey filed this suit on May 7, 2026. Crim, Goodin, and Kleekamp each allege purchases only in May through July 2026. (¶¶ 19, 21–22.)

**The Ace Hardware Cooperative Structure:** Each Ace store signs an Ace Hardware Membership Agreement, which defines each store as "an independent merchant ... operating a retail business at" its listed location. (Ex. B, AHC 2025 Franchise Disclosure Document ("2025 FDD") at 24.) AHC provides Ace stores with wholesale purchasing, national advertising, supply chain services, retail technology, and pricing and inventory benchmarking tools. (¶¶ 49–50, 52, 82.) AHC licenses its trademark to stores and provides guidance for and enforces brand standards. (¶¶ 55, 81 n.86.) Stores pay fees and an annual brand assessment for national branding and marketing initiatives. (*See* Ex. B, 2025 FDD at 13.)

The majority of Ace stores are independently owned. (¶ 60.) As of 2020, approximately 2,017 retailers owned a single store and another 687 owned multiple stores. (¶ 56.) About 250 are "Ace Corporate Stores" (owned by Ace Retail Holdings). (¶¶ 24–25, 58.)

**Pricing "Recommendations":** On the buying side of the cooperative, all Ace stores purchase inventory from AHC at approximately the same wholesale 10%+ cost. (Ex. A, 2025 Report at 10; *see also* ¶ 50.) AHC issues pricing recommendations to Ace stores organized by "Price Zones" and "Price Levels." (¶¶ 74, 98.) Each Ace store is assigned to a geographic "Price Zone." (¶ 98.) AHC offers three "Price Levels" within each zone. (¶ 74.) Level A is the baseline "Ace retail" price. (*Id.*) Level 1 is higher. (*Id.*) Level 2 is the highest. (*Id.*) Ace stores choose which "Price Level" to apply. (¶¶ 6, 98.) Stores can "assign more competitive pricing to selected

items" while "maintain[ing] higher margins on other items." (¶ 107.) "Price Levels" are "recommended," "suggested," and serve as "guidance" to Ace stores which are "encourage[d]," but not required, to follow them. (¶¶ 92, 94–95.) Ace stores can charge whatever retail prices they choose. (Ex. A, 2025 Report at 27 ("While Ace can assist you with recommended product assortment and pricing, you assume responsibility for all aspects of your store's product assortment and pricing."))

There is no alleged enforcement mechanism or any punishment for price deviation. Using Epicor software, AHC allegedly issues "Critical Price Change" alerts to Ace stores triggered by pricing below regional supply center cost, pricing below Ace retail, or violations of a product manufacturer's minimum advertised price policy. (¶ 93.) But an Ace store need not follow the "Critical Price Change" alert or the hotsheet recommendations. (¶¶ 93–94.)

AHC provides "optional" monthly benchmarking "Mango Reports" to Ace stores that subscribe. (¶¶ 84–85; Ex. A, 2025 Report at 21.) A "major piece of Ace's *inventory management* best practices," the Mango Reports show each user the median retail price for comparable products based on peer group data from the prior month. (¶¶ 84, 87.)

Ace stores retain "discretion to depart from the Cooperative's recommendations." (¶ 109.) While stores "routinely adopt all or almost all" of AHC's recommendations, they "do deviate" from them. (*Id.*) Prices at nearby Ace stores "varied by as much as 30%." (¶ 157.) Stores also choose their own Price Level before they open. (¶ 110.) One prospective owner told a city board that its store "will be at retail pricing for Ace, the most competitive." (*Id.*)

**Epicor's Retail Software:** Epicor provides some, but not all, Ace stores with point-of-sale inventory management software and hardware that collects and transmits historical data to AHC. AHC uses that historical data in the Mango Reports and hotsheets. (¶¶ 5, 85, 92.) The use

of Epicor software or hardware is not mandatory. (¶ 16; Ex. A, 2025 Report at 19–20.) The Complaint contains no allegation that Epicor mandates, controls, or enforces prices in any way.

**Higher Prices Reflect Inflation and Supply Shocks:** Prices allegedly rose at Ace stores during the class period. The Complaint acknowledges broader market conditions, including tariffs, affecting prices during that period. It does not expressly address other undeniable factors that caused supply shocks and led wholesale and retail prices to rise generally, nationwide, and at Ace stores, during the class period. (*See* Part I.C below.) The Complaint cites a trade-press article reporting how three buying groups, AHC, Do it Best, and Orgill, planned to respond to new tariffs. (¶ 96 & n.121.) At AHC's 2025 Spring Convention, an AHC executive told retailers, "Just like with the [Section] 301 tariffs in 2018 and 2019, we will protect your margin." (*Id.*) AHC buyers were "negotiating cost justifications and tariff mitigation plans with vendors." (*Id.*) "If price increases occur," AHC would "pass them on to consumers." (*Id.*) The executive urged stores to "keep up with tariff changes." (Ex. K, 2025 U.S. Tariffs Pose Challenges for Independent Hardware Retailers at 4.) Do it Best likewise gave its members "strategic guidance on adjusting suggested retail prices to protect margins." (*Id.* at 2.) The article does not say that AHC's system shares any Ace store's prices with other stores.

**The Store Location Process:** AHC's location process does not restrict entry. AHC reviews applications from prospective Ace stores before granting membership for a specific store location. (¶ 124.) The Complaint quotes Item 12 of the 2022 FDD to describe how location approvals work. (¶¶ 124, 129.) But it omits the portion of that section that states "[y]ou [the store] *will not* receive an exclusive territory." (Ex. C, AHC 2022 Franchise Disclosure Document ("2022 FDD") at 9.) AHC's actual policy is to "grant as many memberships in a given market area as we deem necessary in order for the area to be adequately served by our program." (¶ 129.) AHC has

followed that policy. It added 167 to 174 new stores per year from 2018 to 2020. (¶ 56.) It then *added* 215 stores in 2024. (*Id.;* Ex. D, 2024 Message from Ace President & CEO at 1.)

The Complaint's remaining location allegations show no restriction either. The Complaint notes that AHC uses Sitewise, a commercial site-analytics tool, to evaluate locations. (¶ 131.) It also cites an April 2026 email in which a development manager said he would "run the market work" on four proposed sites. (¶ 130.) Neither allegation shows that AHC denied a single site. The rest come from anonymous Reddit commenters. (¶¶ 132–134.)

The Complaint alleges that Ace stores cannot relocate without AHC approval nor sell their store without giving AHC a right of first refusal. (¶¶ 124, 145.) It does not address whether these are standard franchise-style quality controls, versus evidence of market division.

**The Alleged Product and Geographic Markets:** The Complaint alleges that the relevant product market is "convenience hardware." (¶ 160.) It defines that market to exclude most Ace competitors, including Home Depot and Lowe's, asserting that these "large-format" stores serve a different "core customer" from the Ace customer who "value[s] personal service" and would "not substitute to online retailers." (¶¶ 64, 160, 171.) But the Complaint contradicts itself by using Home Depot and Lowe's as benchmarks in its own Ace store "clustering" analysis. (¶¶ 138–139.) It also omits multiple examples from its cited sources that make clear that Ace faces those two and many other significant competitors.

The Complaint defines the relevant geographic markets as local trade areas within approximately 15 minutes' driving distance of each Ace store. (¶ 173.) With 5,000+ Ace stores nationwide, that means 5,000+ separate geographic markets. Because multiple stores may be within a 15-minute drive, there could be thousands of overlapping "markets" across the country. The Complaint also pleads two alternative geographic markets: (i) each "Price Zone"; or (ii)

Census-designated Metropolitan or Micropolitan Statistical Areas ("MSAs"). (¶¶ 185–186.)

The Complaint alleges what it calls "shares" (but not for antitrust purposes) for a handful of local markets in Colorado, Missouri, Illinois, and Tennessee. (¶¶ 66, 175–182.) Each is limited to only convenience hardware stores within its chosen boundary. (*Id.*) It alleges Ace's share of national "convenience hardware" revenue rose from 28% to 32% between 2020 and 2025. And it admits these figures "do not represent market shares for antitrust purposes." (¶¶ 66, 183.) Based on three of five retailers in the rural Petoskey MSA, it alleges Ace stores comprise over 60%, and often 100%, of local relevant markets. (¶¶ 187, 194.)

## **Legal Standard**

A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The Court does not have to accept "labels and conclusions" or "naked assertions devoid of further factual enhancement." *Id.* (cleaned up). Courts must assess whether "[f]actual allegations" suffice "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Failure to "nudge[] … claims across the line from conceivable to plausible" warrants dismissal. *Id.* at 570. Courts apply "judicial experience and common sense" to this inquiry. *Iqbal*, 556 U.S. at 679.

Groundless claims should be dismissed before subjecting defendants to "the potentially enormous expense of [antitrust] discovery[.]" *Twombly*, 550 U.S. at 559–60. "Conclusory allegations that a defendant agreed, conspired, or colluded" are insufficient to plead a Section 1 violation. *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021) (affirming dismissal) (cleaned up). Allegations "merely consistent with" agreement do not suffice. *Twombly*, 550 U.S. at 557. Courts therefore should dismiss where

allegations "could just as easily reflect innocent conduct or rational self-interest." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022).

## Argument

To plead a Section 1 claim, a plaintiff must plausibly allege that each defendant "(1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Marion Diagnostic*, 29 F.4th at 349. The Complaint meets none of these three requirements.

### I. The Complaint Does Not Plead a Price-Fixing Agreement (Cause of Action I)

To plead the requisite agreement in an antitrust conspiracy, the Complaint must allege that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) (cleaned up). An antitrust conspiracy can be alleged through direct or circumstantial evidence of agreement. *Id.* at 764. The Complaint alleges neither.

#### A. There Is No Direct Evidence of Agreement

The Complaint does not plead direct evidence of an unlawful agreement among Defendants. Direct evidence in an antitrust case is "like an admission by a defendant that a party conspired." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (cleaned up). Stray "references to an agreement" are insufficient. *Twombly*, 550 U.S. at 565 n.10.

The Complaint alleges three types of conspiratorial agreements: (i) a horizontal agreement between AHC, the Ace stores, and Epicor; (ii) a hub-and-spoke agreement with AHC and Epicor as the hubs and Ace stores as the spokes; and (iii) an agreement to exchange information. Yet the Complaint contains no allegations regarding the contours of the supposed agreement among Ace and Epicor. It is "essential to show that a particular defendant joined the purported conspiracy and knew of its scope." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013); *see also Ass'n*

*of Am. Physicians & Surgeons v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *9 (N.D. Ill. Sept. 22, 2020) (dismissing with prejudice a Section 1 claim, reasoning "there are no plausible factual allegations about how [alleged conspirators] entered into an arrangement"), *aff'd*, 15 F.4th 831 (7th Cir. 2021). That AHC and the Ace stores each entered into vertical contracts with Epicor for Epicor's point-of-sale software services does not satisfy the first element of a conspiracy claim. (¶ 16); *see Always Towing*, 2 F.4th at 705–06 (contract between a "seller" and "buyer/service provider" was a "vertical restraint," not evidence of a conspiracy).

The allegations specific to the Ace Store Defendants are no better. Each Ace Store Defendant allegedly uses Epicor, participates in Ace Rewards, and shares a Price Zone and Price Level with one or more nearby Ace stores. (¶¶ 27–35.) Choosing the same supplier's suggested price level is parallel conduct, not direct evidence of an agreement to fix prices. *Twombly*, 550 U.S. at 556–57. The Complaint simply inserts the Ace Store Defendants' names into allegations about all 5,000+ Ace stores, obviously in some effort to fix what Plaintiffs must have thought to be a shortcoming of the earlier version of the Complaint. (¶¶ 70, 71, 81, 84, 235.) It does not show that any particular Ace Store Defendant "joined the purported conspiracy and knew of its scope." *Knight*, 725 F.3d at 818.

### B. There Is No Indirect or Circumstantial Evidence of a Conspiracy

Absent any direct factual allegations of unlawful agreement, Plaintiffs bear the burden of pleading facts that raise a plausible inference of conspiracy. *Twombly*, 550 U.S. at 556. In the Seventh Circuit, "for circumstantial evidence to indicate an agreement, the plaintiffs must allege parallel conduct by the defendants and context that raises a suggestion of a preceding agreement—often called plus factors." *In re Manufactured Home Lot Rents Antitrust Litig.*, 2025 WL 3485693, at *8 (N.D. Ill. Dec. 4, 2025) (cleaned up). Courts view plus factors holistically. *Id.* at *9. The

Complaint should be dismissed because the alleged conduct, including plus factors, is "merely consistent with[,]" rather than suggestive of, a price-fixing conspiracy. *Twombly*, 550 U.S. at 557.

**Opportunities to Conspire:** The Complaint's allegations of "opportunities to conspire" ring hollow. Alleged "regional store meetings, private internet forums, and Ace conventions" are not enough. (¶ 197.) The Complaint merely alleges that David Cripe, an officer of Ace Store Defendant Whitmore Investments, Inc., sits on AHC's board. (¶¶ 34, 54.) But at least 75% of AHC's directors must own or manage an Ace store. (¶ 54.) Plaintiffs allege nothing Cripe said, proposed, or agreed to do. Shared membership in an organization is "unspectacular" and "fail[s] to move the needle" absent "facts addressing the content of defendants' discussions." *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018).

**Use of the Same Software:** Courts have dismissed complaints—including where a software or data utility company is a defendant—on the basis that they cannot infer a plausible price-fixing agreement from the simple fact that defendants use the same pricing software. *See, e.g.*, *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462 (9th Cir. 2018) (rejecting argument that "clearinghouse for pricing information" coordinated collusive behavior). This is because the use of revenue software, like Epicor Eagle or the Mango Report, is ordinary business conduct, not evidence of collusion. In *In re Passenger Vehicle Replacement Tires Antitrust Litigation*, the plaintiffs alleged that the defendants conspired by using revenue management software that "would permit defendants 'to have access to the same data and filter hundreds of lines of pricing data by part number, brand, product, size, and speed[,]'" and "compare competitor prices through a Pricing Insights tool" that allowed the exchange of non-public information to set pricing strategy. 767 F. Supp. 3d 681, 713–14 (N.D. Ohio 2025). The court concluded that the "plaintiffs allege[d] lawful and ordinary business practices from which they hurriedly infer[red] collusion." *Id.* at 714. Such

behavior, the court found, was not evidence of tacit agreement. *Id.* at 715. Rather, the plaintiffs' claims amounted to nothing more than that "it was possible [] to use a licit tool for illicit means, a possibility which exists for any tool, used by any company, in any industry." *Id.*

This is particularly true where, as here, users are not required to accept pricing recommendations provided by or through a software program. *Gibson v. MGM Resorts Int'l,* 2023 WL 7025996, at *3 (D. Nev. Oct. 24, 2023). The Complaint does not allege that all Ace stores are required to use Eagle, let alone required to accept AHC's alleged pricing recommendations delivered by Eagle. The Complaint refers to AHC's pricing information as "guidance," (¶¶ 5–6), "recommendations," (¶¶ 74, 92, 95, 97–99, 107), and "suggested," (¶ 92). Each Ace store "determines the pricing strategy for his or her own stores[.]" (Ex. A, 2025 Report at 11.) AHC tells retailers "you assume responsibility for all aspects of your store's product assortment and pricing." (*Id.* at 27.) Ace stores have "the right, on a case by case basis, to adopt *or not adopt*" qualifying discounts. (Ex. B, 2025 FDD at 41.)

The Complaint tries to throw in a few adverbs to create the image that stores lack discretion in pricing decisions. With no support, it pronounces in conclusory fashion that Ace stores "routinely adopt all or almost all of the recommended prices." (¶ 109.) It adds that their "discretion" is "rarely exercised." (*Id.*) The inclusion of adverbs like "routinely" and "rarely" is insufficient to show that there is some mandate or agreement on prices. If anything, the acknowledgment that there is "discretion" reinforces that there is no mandate to follow these recommendations.

The Complaint describes "Critical Price Change" alerts as the only response to non-compliance—and those were also optional—which belies the conclusion that Defendants enforced specific pricing. (¶¶ 6, 94, 118.) This too is fatal to the claims. *See In re Turkey Antitrust Litig.*,

2026 WL 1960792, at *25 (N.D. Ill. July 7, 2026) (finding no hub-and-spoke conspiracy where "there was no communication between [data aggregator] and the [defendants] instructing them to raise their prices"); *Gibson*, 2023 WL 7025996, at *3, *7–8 (dismissing where plaintiffs did not allege that pricing algorithm's recommended prices had to be adopted).

The Complaint also points to one store owner's application for a business loan from his Kansas municipality as evidence of owners "commit[ting] to charging [a] particular price level at the[ir] store" before it opened. (¶ 110; Ex. J, City of Coffeyville October 8, 2019 Meeting Agenda at 7.) The "pre-commitment" Plaintiffs tout is, in fact, the response to a question posed on the application, which asks the applicant to "[d]escribe the pricing … structure" and whether they will be on the "low end, mid-range, or high end." (Ex. J, City of Coffeyville October 8, 2019 Meeting Agenda at 7.) That is not, as Plaintiffs framed it, a pre-commitment to charge particular price levels before their stores open. It is instead a business owner describing his pricing strategy to the city from which he applied for a loan—and in this case, that his store will use the lowest and "most competitive" pricing level. (¶ 110.)

**Motive to Increase Profits:** "[A] motive to increase [] profits … is not a plus factor and does not give rise to an inference of conspiracy because … such motivations always exist." *In re Manufactured Home*, 2025 WL 3485693, at *12. "In a free capitalistic society," "[p]rofit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134–35 (3d Cir. 1999). The Complaint's allegation that Ace stores were seeking to increase profits is therefore not a valid plus factor. (¶¶ 12–13.)

**Market Concentration:** The Complaint alleges that Ace stores frequently comprise 60–100% of local relevant markets. (¶¶ 187, 194.) As explained below in Part V.A, these conclusory

percentages artificially exclude competitors. According to the Complaint's cited materials, Ace competes in a "highly fragmented and intensely competitive" marketplace. (Ex. A, 2025 Report at 14, 26.) Even if these concentrations were accurate, market concentration still would not make the conspiracy plausible. Even in a highly concentrated industry with a homogeneous product and inelastic demand, "it cannot be the case that allegations that a market is oligopolistic and a product is homogeneous are sufficient to survive a motion to dismiss." *Washington Cnty. Health Care Auth.*, 328 F. Supp. 3d at 841. Otherwise, any antitrust complaint in a concentrated industry would always survive dismissal, which plainly is not the law. *See id.*

**Barriers to Entry:** Barriers to entry are "simply descriptions of the market, not allegations of anything that the defendants did." *Tires Antitrust Litig.*, 767 F. Supp. 3d at 718 (cleaned up). Market structure may make collusion feasible, but it does not make collusion plausible. *See id.* That the Complaint alleges high startup costs and limited access to national cooperatives does not make collusion plausible here. (¶¶ 190–192.)

**Inelastic Demand and Fungible Products:** The Complaint alleges that demand for products sold at convenience hardware stores is inelastic and products are fungible. (¶¶ 195–196.) These are textbook market-structure allegations. They "do[] little to ... render the alleged conspiracy plausible" because they "merely indicate[] that a conspiracy *could* have formed[.]" *Tires Antitrust Litig.*, 767 F. Supp. 3d at 718–19 (emphasis in original). And these are allegations about the *products* being sold—which is not the market the Complaint asserts was restrained.

### C. There Are Obvious Alternative Explanations for Price Increases

*Twombly* emphasizes the importance of "obvious alternative explanation[s]" when assessing whether alleged conduct resulted from conspiracy. 550 U.S. at 567. "Alternative explanations can serve to demonstrate that Plaintiff's conspiracy claims are not plausible." *In re Manufactured Home*, 2025 WL 3485693, at *13 (cleaned up).

The Complaint alleges consumers were charged higher prices (¶ 201), for which its incorporated sources provide obvious non-conspiratorial explanations. The period at stake was one of rampant and well-known price shocks across the economy. Hardware-manufacturing costs rose significantly during the period from 2018 to 2025. (Ex. E, U.S. Bureau of Labor Statistics, Producer Price Index by Industry at 1.) AHC's 2022 Message to Shareholders described "rampant inflation and rising interest rates." (Ex. F, 2022 Message from the President at 1.) COVID drove unprecedented sales in 2020 and 2021. Retailers struggled to meet demand. Suppliers scrambled for products and shipping lanes. Tariffs in 2025 added to the already existing upward pricing momentum. (Ex. G, Ace reports 'record-breaking' Q1 revenues at 2.) Increasing prices in these macroeconomic conditions is consistent with rational self-interest. It is not plausible evidence of conspiracy. *See In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 2026 WL 879018, at *21–24, *44 (N.D. Ohio Mar. 31, 2026) (holding COVID-19, inflationary pressures, supply-chain disruptions, and volatile input costs supplied obvious non-conspiratorial explanations). These realities refute the notion of a conspiracy.

The Complaint outright concedes the rather obvious reality that *tariffs* drove price increases. It cites an article quoting AHC's Senior Vice President of Merchandising, who explained that AHC buyers were "negotiating cost justifications and tariff mitigation plans with vendors," and that "[i]f price increases occur," they would be passed "on to consumers." (¶ 96 & n.121; Ex. K, 2025 U.S. Tariffs Pose Challenges for Independent Hardware Retailers at 3.) In the same allegation, the Complaint tries to paraphrase that article as describing a system that would use Ace data "to transmit collective price increases more rapidly than weekly hotsheets." (¶ 96.) But the article says nothing of the sort. It describes a system to track "tariff-related pricing changes." (Ex. K, 2025 U.S. Tariffs Pose Challenges for Independent Hardware Retailers at 4.)

Those are changes in tariff costs, not competitors' prices. The "hotsheets" comparison is Plaintiffs' own gloss. The Complaint hedges with "[i]n other words" and then cites no source. (¶ 96.) Such "naked assertion[s]" do not suffice. *Iqbal*, 556 U.S. at 678.

In all events, it is well established that the mere existence of higher prices does not equate to price fixing. *Chicago Pro Sports LP v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996). It is not Defendants' fault that exogenous events like tariffs impacted the market. Passing on higher supplier costs is rational, unilateral conduct, and AHC's rivals did the same. Do it Best gave its members "strategic guidance on adjusting suggested retail prices to protect margins." (Ex. K, 2025 U.S. Tariffs Pose Challenges for Independent Hardware Retailers at 2.) Orgill urged retailers to buy ahead of the tariffs. (*Id.*) These allegations themselves confirm that the cause of alleged price increases in the marketplace was the massive exogenous event created by the widespread imposition of tariffs.

**D. There Is No Plausibly Alleged Hub-and-Spoke Conspiracy**

When an alleged conspiracy involves participants at different levels of a distribution chain, the plaintiff must "allege both that there was a central coordinating party (the 'hub'), and that each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020). A "'hub-and-spokes conspiracy' requires a 'rim' connecting the various horizontal agreements." *Id.*; *see also In re Fico Antitrust Litig. Related Cases*, 2023 WL 6388247, at *7 (N.D. Ill. Sept. 28, 2023) (plaintiffs must allege "each participant (along the 'rim') recognized that it was part of the greater arrangement") (cleaned up); *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435–36 (6th Cir. 2008) (affirming dismissal where no facts suggested a horizontal agreement among spokes).

The Complaint alleges that AHC and Epicor were "hub[s]" and Ace stores were "spoke[s]." (¶ 215.) Beyond conclusory allegations that Ace stores agreed to "coordinate local prices," there are no facts plausibly suggesting that Ace stores agreed to accept AHC's pricing recommendations on the condition that others were doing the same, conditioned price increases on other Ace stores increasing prices, or policed other Ace stores' compliance with adopting recommended prices. (¶¶ 3, 74–77, 215–216.) And neither alleged "hub" (AHC nor Epicor) mandates pricing. As discussed above, each Ace store sets its own pricing and there is no enforcement mechanism. The Complaint concedes that Plaintiffs' nearby Ace store prices "varied by as much as 30%." (¶ 157.) What is more, the Complaint alleges that Palos Ace Hardware and Lemont Ace Hardware share the same owner and are in the same Price Zone. (¶ 111.) Yet it acknowledges that they have different Price Levels and charge different prices. (¶¶ 111–112.)

The Complaint's hub-and-spoke allegation rests on a mere label, not actual allegations that could state a claim for conspiracy. (¶ 215.) It asserts that each Ace Member Store "enters into the conspiracy with Ace Hardware Corporation and Epicor Software Corporation based upon the knowledge of the broader conspiracy and other Ace Member Stores' participation," and that the stores "also agree with their fellow Member Stores to participate in the conspiracy." (*Id.*) A label is not a rim. A hub-and-spoke conspiracy requires a "rim" connecting the spokes. *Marion Healthcare*, 952 F.3d at 842. Plaintiffs allege no store that agreed with AHC or Epicor on the condition that other stores do the same. Naming multiple retailers who signed the same vertical agreements does not supply a rim.

Mere knowledge that other stores use the same cooperative tools does not suggest a conspiratorial agreement. *See Segal v. Amadeus IT Grp., S.A.*, 2025 WL 963751, at *5 (N.D. Ill. Mar. 31, 2025) (concluding that allegations that defendants used common software knowing that

they would receive access to forward-looking data of their competitors was insufficient to allege a rim); *Marion Healthcare*, 952 F.3d at 841–43 (declining to find hub-and-spoke conspiracy where complaint merely alleges "that the distributors buy and sell the devices in accordance with the terms of [] contracts"). The fact that a third party collects and distributes data is also insufficient to create a hub-and-spoke conspiracy. *In re Turkey Antitrust Litig.*, 2026 WL 1960792, at *25.

## II. The Complaint Fails to Plead Actionable Market Allocation (Cause of Action II)

The Complaint's second claim should be dismissed for failure to plausibly plead an agreement among competitors to allocate or "not [] compete" in territories. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990).

### A. AHC's Alleged Site Selection Process Is Not an Agreement to Divide Territories

The Complaint's attempt to twist AHC into a shell association like in *Topco* is without merit. (*See* ¶ 7.) *Topco* involved explicit, formal, exclusive territories and an association organized around those territories to launder those manufactured exclusivities into legitimacy. *United States v. Topco Associates*, 405 U.S. 596, 601–04 (1972). It was a naked restraint of trade. *Id.* at 610–12. Ace is different: stores do "not receive an exclusive territory." (Ex. B, 2025 FDD at 15.) Ace stores "may face competition from other member stores[.]" (*Id.*) AHC's policy is "to grant as many memberships in a given market area as [it] deem[s] necessary[.]" (*Id.*) AHC may conduct "market studies using available competitive and demographic information" before deciding whether to approve a membership application. (*Id.* at 14.) This is standard due diligence, not a mechanism for allocating markets among competitors or a guarantee of sales, profitability, or protection from nearby competition. The Complaint's own allegations bear this out. Ace added 167 to 174 new stores per year from 2018 to 2020, and 215 in 2024—hardly the hallmark of a scheme to restrict entry. (¶ 56.)

The Complaint's allegations about transfer and right of first refusal procedures are also not horizontal market allocations. (¶¶ 223–224.) Both refer to alleged vertical agreements between AHC and Ace stores. The Complaint does not allege that any Ace store agreed with another store to restrict transfers to competing stores.

The Complaint's own examples undermine any notion of divided markets. It alleges that there are 21 Ace stores in Chicago, Palos Heights, and Palos Hills. (¶ 185.) That overlap would have been impossible under *Topco*'s exclusive territorial licenses. The new-entry allegations point the same way. AHC added between 167 and 174 stores per year between 2018 and 2020. (¶ 56.) It opened 215 new member stores in 2024. (*Id.*) More than half of the 2018-to-2020 additions were new hardware stores. (*Id.*) A cartel restricts entry to protect incumbents. Adding hundreds of stores is expanding the cooperative's network, not dividing markets.

The Complaint claims that AHC's review of proposed store sites shows that Ace stores hold exclusive territories. (¶ 130.) But the cited allegation says only that AHC would "run the market work on all 4 sites" to determine whether they "don't conflict with other existing Ace stores." (*Id.*) That is the market study AHC's franchise disclosure documents describe. (Ex. B, 2025 FDD at 14.) Nothing in the allegation suggests that AHC refused any site. Nothing suggests that any existing store had input or a veto. The Complaint's gloss that "clear markets" means exclusive territories contradicts the very documents it relies on. (¶ 130; Ex. B, 2025 FDD at 15.)

Nor do the Sitewise allegations plausibly suggest an agreement to divide markets. The Complaint alleges that "Ace Hardware Corporation employees later explained" to the store owner described in ¶ 130 that AHC uses Sitewise to help determine "whether a new location would compete with an existing Ace Member Store." (¶ 131.) It then quotes Sitewise's website, which says the tool helps users "balance[] net new sales and cannibalization." (*Id.* & n.143.) Taken as

true, these allegations show only that AHC considers whether a new store would draw sales from existing stores. That is ordinary site selection, not market allocation. The Complaint does not allege that any Ace store agreed with another to stay out of its territory. At most, AHC's site review is ancillary to a procompetitive venture. *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188–89 (7th Cir. 1985). It looks nothing like the formal, exclusive territories in *Topco*. 405 U.S. at 601–04.

### B. There Is No Plausible Horizontal Agreement to Divide Territory

The Complaint fails to allege facts plausibly suggesting an agreement to divide territory. *Twombly*, 550 U.S. at 557. It asserts that Ace and its members conspired to implement a horizontal market-allocation scheme. (¶¶ 223–224.) But it never says which stores agreed with which other stores to divide a market. It identifies no map of divided territories. It alleges no communications in which competing stores agreed to stay out of each other's markets. It does not allege any incumbent store had a contractual right to exclude a rival Ace store from any defined area. The assertion that Ace stores "also agree with their fellow Member Stores" is a legal conclusion, not a pleaded fact. (¶ 226.) Every agreement the Complaint identifies is between AHC and a single store, including the Membership, Right of First Refusal, and Store Development Agreements. (¶¶ 8, 145, 147.)

## III. There Is No Plausibly Alleged Relevant Market (Causes of Action I, II, III)

There cannot be a restraint of trade without a market to be restrained. The "entire point" of antitrust law is "to protect competition in the commercial arena." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012). "It is the existence of a commercial market that implicates the Sherman Act in the first instance." *Id.* Any Section 1 case under any framework therefore must allege a plausible relevant market. *In re Multiplan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 629–30 (N.D. Ill. 2025). The "failure to allege the existence of a relevant

commercial market is fatal … whether per se, quick-look, or rule-of-reason analysis is applied." *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019).

### A. The Complaint Fails to Plead a Plausible Relevant Product Market

A properly alleged market encompasses all products or services that are "reasonably interchangeable" for the purposes for which they are produced.[5] *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *see also Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926, 945 (N.D. Ill. 2019) (defining product market for Section 1 claims as "the reasonable interchangeability of the products and the cross-elasticity of demand for those products"). "Courts should dismiss a claim when the alleged relevant market clearly does not encompass all interchangeable substitute products" or "fails even to attempt a plausible explanation as to why a market should be limited in a particular way." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (cleaned up). The market must be "supported by facts of reasonable interchangeability from the perspective of the consumer." *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1012 (N.D. Ill. 2017) (cleaned up). "Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

The Complaint asserts a product market limited to "convenience hardware" stores—Ace and Do it Best. (¶¶ 62, 65.) It does not focus on the products being sold, but on the nature of the stores. This contrived market ignores commercial realities and excludes many obvious and

[5] Courts frequently utilize the same market definition standards in Sherman Act § 1 and § 2 cases. *See, e.g.*, *Am. Needle, Inc. v. New Orleans Louisiana Saints*, 385 F. Supp. 2d 687, 692 (N.D. Ill. 2005); *Reapers Hockey*, 412 F. Supp. 3d at 952; *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 277 (N.D. Ill. 2019).

interchangeable substitutes available to consumers.

Ace stores are allegedly part of a "convenience hardware segment" within "the overall home improvement industry." (¶ 160.) The home improvement industry "consists of a broad range of products and services, including lawn and garden products, paint[,]" and supplies "typically used in connection with home and property improvement." (Ex. H, AHC 2021 Annual Report at 3.) The actual products comprise a wide range available from many sellers beyond just Ace stores. The Complaint's cited sources expressly confirm that Ace stores "compete directly or indirectly with 'big-box' home improvement centers (e.g., The Home Depot, Lowe's, Menards and others) ... mass merchandisers, warehouse clubs and discount stores (e.g., Walmart, Sam's Club, Costco, Target, and Tractor Supply) ... and Internet-based retailers (e.g., Amazon.com)," (Ex. A, 2025 Report at 14), and "other stores that offer the same types of products and services," including specialty stores and stores "associated with national or regional chains." (Ex. B, 2025 FDD at 8.) In fact, approximately 96% of surveyed Palos Ace customers (like Twomey) "shop at competing big-box stores in addition to Palos Ace." (Ex. I, What's Your Price Image? at 2.)

The Complaint's attempt to justify excluding these competitors (and many more competing retailers) from the relevant market based on Ace's "core customers" being "mission shoppers" is unavailing. (¶ 165.) The Complaint alleges that Ace customers prefer service and convenience that it declares only Ace and Do it Best stores can offer. (¶¶ 62–65, 160, 165.) That contention is conclusory and lacks any factual support. But even if such preferences existed, the product market would still fail. Consumer preference does not permit the exclusion of obvious substitutes. *Maui Jim*, 386 F. Supp. 3d at 946 (preference for a particular soda or television network does not negate the existence of reasonably interchangeable ones). Consumer preference for a particular product does not make that product so unique that it cannot be substituted.

The alleged relevant "product" here—retail purchases at convenience hardware stores—is not so unique to constitute a market separate from large-format big-box and other retail competitors that offer the same merchandise. The Complaint's cited materials actually confirm the vigorous competition with big-box and other retail competitors. (Ex. J, City of Coffeyville October 8, 2019 Meeting Agenda at 7 (opening a local Ace store will mean local customers have "no need to go to the Big Box retailer" and will be able to "stay local in the community for their needs" instead)). The "convenience hardware" limitation essentially posits a *de facto* single brand market consisting of Ace stores. The law forbids just this sort of single-brand market absent "factual allegations that make it plausible there is no substitute." *Maui Jim*, 386 F. Supp. 3d at 945 (cleaned up). There are obvious substitutes here.

**B. The Complaint Fails to Plead a Plausible Relevant Geographic Market**

The Complaint takes a scattershot approach by alleging three implausible geographic markets. The first, "local trade areas" defined as a 15-minute driving distance from each store, are absurdly small and self-contained. (¶ 173.) The second, "Price Zones," are not connected to a measurable physical space. (¶ 185.) The third, census-designated MSAs, are too large for a "local" convenience store and directly contradict the first geographic market. (¶ 186.)

**1. The alleged "local trade area" markets are implausibly small because each Ace store effectively would be its own geographic market.**

"Absurdly small" geographic markets that fail to align with "any sensible awareness of commercial reality" should be dismissed. *42nd Parallel North v. E St. Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) (affirming dismissal where the central business district of a Chicago suburb was an "absurdly small" geographic market). It does not "take a market researcher to know" that many alternatives exist outside the business district of a suburb or the suburb itself. *Id.*

The Complaint's proposed "local trade area" is a similar fiction. (¶ 173.) The Complaint

creates a contrived geographic market around each Ace store by narrowing it to "the area within approximately 15 minutes' driving distance of each Member Store's location." (*Id.*) Many Ace stores are effectively in their own geographic markets. This 15-minute radius is contradicted by the very loan application cited by Plaintiffs (¶ 110), which describes that customers may come from as far as 30 miles away and traveled to "neighboring communities and out of state to Big Box retailers." (Ex. J, City of Coffeyville October 8, 2019 Meeting Agenda at 7.) The application also treats the new stores' competition as including "Big Box" stores. (*Id.*)

As in *42nd Parallel North*, the Complaint unjustifiably excludes numerous "competing stores"—such as Home Depot and Lowe's—that are inside the 15-minute boundaries, as well as those outside the arbitrary 15-minute boundaries that common sense makes clear are competing. (¶¶ 64, 135.) As the Seventh Circuit held in similar circumstances, "[i]t defies belief to suggest that [here, an Ace store] could raise [] prices substantially without losing customers to competitors outside th[e] tiny area" encompassed by a 15-minute driving radius. *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (dismissing complaint that alleged the geographic market for pharmacies was a five-block radius around the plaintiff's pharmacy). "By any sensible awareness of commercial reality," Ace stores are "swimming in a much larger competitive sea." *42nd Parallel North*, 286 F.3d at 406.

The allegation that 75% of the U.S. population lives near an Ace store is of no consequence. (¶ 63.) The Complaint provides no plausible allegation as to how far consumers actually travel or how far they are willing to travel for substitutes. It ignores mileage disparities between urban and rural areas, disparities in willingness to travel by product, and the fact that consumers shop both offline and online. "To the extent Town B residents go into City A to work or to shop, they regard the City [] stores as interchangeable[.]" *Bathke v. Casey's Gen. Stores*, 64 F.3d 340, 346 (8th Cir.

1995) (quoting Herbert Hovenkamp, *Federal Antitrust Policy*, § 3.6d, at 113–14). An Ace consumer could shop at a store close to home one day and another near their office the next. But according to Plaintiffs' alleged "local trade area" market, if the driving radius between those stores exceeds 15 minutes, they do not compete.

That allegation ignores how Plaintiffs themselves describe how they shop. Plaintiff William Crim alleges that he made purchases in the same month from two different Ace stores in two different Colorado towns: Crested Butte Ace Hardware in Crested Butte, and Fullmer's Ace Hardware in Gunnison, approximately 30 miles away. (¶ 19.) And Plaintiff Jason Goodin, who lives in Mesa, Arizona, alleges purchases from an Ace store in Granby, Colorado, hundreds of miles from his home. (¶ 21.) Customers buy hardware where they live, work, and travel, not within a fixed 15-minute circle around a single store. Again, Plaintiffs' own sources directly contradict this fiction. (Ex. J, City of Coffeyville October 8, 2019 Meeting Agenda at 7.) (new Ace store "will have customers come from up to 30 miles away.") These factors cannot be ignored at the pleadings stage, where the law requires plausibility and application of both common sense and undeniable "commercial realit[ies]." *Car Carriers, Inc.*, 745 F.2d at 1110.

**2. The alleged "Price Zone" markets conflict with commercial realities and are not defined with sufficient specificity.**

The alleged "Price Zone" markets are equally divorced from commercial reality and implausibly imprecise. (¶ 185.) The "Price Zones" do not constitute "the area of effective competition" required for a plausible geographic market. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018).

The Complaint itself demonstrates the implausibility of "Price Zones" as geographic markets. It concedes that stores in different "Price Zones" compete for the same customers. (*See, e.g.*, ¶ 118, describing Ace stores in different "Price Zones" as "local competitors.") It alleges that

nearby stores can be in different "Price Zones." (*E.g.*, ¶ 114, "Lemont Ace Hardware is ... just 8 miles from this Buikema's Ace location, but in a different Price Zone.") Stores in different "Price Zones" cannot be in different geographic markets if, as the Complaint alleges, they are in close proximity and compete with each other.

The amorphous "Price Zone" concept also fails to specify the area constituting the alleged geographic markets. The Complaint vaguely alleges that AHC "organizes Ace stores into locally defined geographic 'Price Zones.'" (¶ 6.) But it does not even loosely map the "Price Zones" or define their areas or sizes, leaving the Court unable to assess whether "Price Zones" are too small or too large to be plausible geographic markets. And by definition, "Price Zones" ignore many alternative retail stores (including nearby Ace stores in different "Price Zones") where consumers can practicably turn. *See 42nd Parallel North*, 286 F.3d at 406 (affirming dismissal of § 1 case proposing absurdly small geographic market that artificially excluded the "many shopping venues" in the Chicagoland area "where consumers could" turn).

**3. The catch-all alleged MSA geographic markets are implausibly broad and undermined by the Complaint's allegations.**

A geographic market is implausibly broad when it "contradicts [] allegations that [consumers] are unlikely to look at alternative[s] that are a significant commute from work or school." *In re Manufactured Home*, 2025 WL 3485693, at *16 (dismissing the "plead[ed] large MSAs" as implausible markets). A broad geographic market that "confounds[] th[e] alleged reality" of a localized market fails. *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 529 (M.D. Tenn. 2023) (dismissing where proposed MSA market for student housing contravened commercial reality that students would live near campuses).

The Complaint's third alternative market for so-called "convenience hardware stores is the Census-designated Metropolitan or Micropolitan Statistical Area in which the store is located." (¶

186.) This implausibly broad "market" is undermined by the Complaint's contention that the alleged product markets "are highly local; stores compete for customers by locating themselves in close proximity to residential areas and find their customer base in those [areas]." (¶ 63.) The Complaint even seeks to exclude "large-format" stores from the relevant market by alleging that large-format store customers are "willing to travel farther distances to their hardware suppliers than convenience hardware store customers are." (¶ 64.) The Complaint cannot plausibly claim that Ace customers "will frequently not be willing to travel the farther distance to a large-format hardware store," but then allege MSA geographic markets that span multiple counties. (¶ 170.)

### C. The Local Examples Do Not Allege Antitrust Markets

The Complaint tries to state that there are local markets, and cites supposed examples in Colorado, Missouri, Illinois, and Tennessee. (¶¶ 175–182.) But in each one, the Complaint merely identifies the Ace stores and states nothing about *any* other competitor. (See Part III.A, *supra*.) Yet the very documents the Complaint incorporates are adamant that Ace stores compete with big-box home centers, mass merchandisers, warehouse clubs, and online retailers. (Ex. A, 2025 Report at 14.) Not one of the supposedly "local" market formulations accounts for them. Once again, the Court need not "don blinders" or "ignore commercial reality." *Car Carriers, Inc.*, 745 F.2d at 1110.

The actual allegations reinforce the implausibility of the claims. The Complaint asserts that only two convenience hardware stores serve Maryville, Illinois. (¶ 179.) But it then acknowledges six more stores "just outside the highlighted area" (whatever that means) in a footnote. (*Id.* n.181.) The reason the Complaint never states why the supposed market stops exactly where those competitors begin is because it defies just the sort of common sense necessary to move a complaint into the realm of plausibility. The Complaint posits Ace stores would still hold 75% of a broader market. (*Id.*) But that figure, too, is silent about every big-box retailer and

online competitor. It does not allege that Maryville residents lack access to a Home Depot, a Lowe's, or online retailers such as Amazon. (¶¶ 64, 179.) Having left them out, Plaintiffs are left with an implausible market that is "absurdly small." *42nd Parallel North*, 286 F.3d at 406.

The rural markets are equally implausible. The Complaint states that no other convenience hardware store is within 15 minutes of the stores in Crested Butte, Gunnison, or Granby, Colorado. (¶¶ 175, 177.) The Complaint does not allege that those residents confine their shopping to a 15-minute radius. It does not address whether they drive to larger towns or buy online. It does not allege that those residents lack access to mass merchandisers like Walmart or Tractor Supply, which the Complaint's own cited sources identify as direct competitors. (Ex. A, 2025 Report at 14.) Nor does it allege that those residents were unable to shop at "other stores that offer the same types of products," including "national or regional chains." (Ex. B, 2025 FDD at 8.) Those are the commercial realities the Complaint ignores. Once they are accounted for, it "defies belief" that a single store could raise prices without losing those customers. *Sharif Pharmacy*, 950 F.3d at 917.

The Missouri market allegations are equally unavailing. The Complaint concedes six other convenience hardware stores sit within 15 minutes of Rick's Ace. (¶ 176.) It alleges three near Westlake Ace in Washington but does not name them. (¶ 178.) The Complaint does not allege either area lacks big-box retailers like Walmart or Lowe's or other stores offering the same types of products.

The Complaint also abandons its own approach when it gets to the Chattanooga market. The Complaint defines its local trade area markets by measuring from "each Member Store's location." (¶ 173.) However, for Chattanooga, it measures from a neighborhood instead. (¶ 181.) The Complaint does not explain why it chose to start at that point. Nor does it allege that the two Ace stores it counted are the only hardware options for Lookout Mountain residents.

Each purported "market" reaches its result the same way. The Complaint draws the line first, counts the stores second, and leaves out whatever does not fit. A market built on those omissions does not "correspond to the commercial realities of the industry." *Sharif Pharmacy*, 950 F.3d at 917. The share figures proposed in the Complaint reflect an implausible gerrymander, not market power. (*See* Part V.A, below.)

## IV. The Information Provided to Ace Stores Does Not Support an Antitrust Information Exchange Claim (Cause of Action III)

The third cause of action recycles the insufficiently alleged price-fixing allegations to assert a standalone "anticompetitive information exchange" claim. As with all Section 1 claims, the Complaint must first allege that there was a horizontal conspiracy, which it does not do for the reasons set forth in Part I above.[6] But the information exchange claim also fails because the Complaint does not plausibly allege an agreement to do something anticompetitive with information capable of facilitating coordination. *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *3–6 (N.D. Ill. Aug. 29, 2022).

The "nature of the information exchanged" is key in determining whether an information exchange has substantial anticompetitive effect. *Segal*, 2025 WL 963751, at *6; *see also In re Manufactured Home*, 2025 WL 3485693, at *14 (same). "[A]n agreement to share information, even sensitive non-public data such as pricing data ... does not, without more, plausibly plead the agreement/concerted-action element of a § 1 claim[.]" *Segal v. Amadeus IT Grp., S.A.*, 2026 WL 879583, at *4 (N.D. Ill. Mar. 31, 2026). Nor is the exchange of information "on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged." *Id.* (cleaned up). In evaluating whether information exchange crosses the line into anticompetitive

[6] As discussed in Part V below, information exchange claims are subject to the Rule of Reason. *In re Manufactured Home*, 2025 WL 3485693, at *14.

conduct, courts examine "(1) whether the information is current or past; (2) whether it identifies particular parties, transaction[s], and prices; and (3) whether the data is publicly available." *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 678 (N.D. Ill. 2023). This Complaint fails on all three factors.

*First*, the information exchanged is, by the Complaint's admission, historic rather than current. The "Mango Reports" allegedly used "to confirm that nearby competitors are moving in tandem on any given SKU" are delivered "*monthly*," and pricing hotsheets "*weekly*." (¶¶ 99, 104.) Unlike cases where courts have permitted information exchange claims to proceed, the data allegedly exchanged here is neither forward-looking nor strategic. *See In re Multiplan Health Ins. Provider Litig.*, 789 F. Supp. 3d at 614; *In re RealPage*, 709 F. Supp. 3d at 478. Exchanges of past pricing data are "greatly preferred" because the potential for anticompetitive harm is comparatively minimal. *Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001). The allegation that data is *provided* to AHC daily (¶ 47) does not move the needle, nor does the allegation that the system tracked tariff-related changes to recommendations in "real time" (¶ 96).[7] Information collected daily, but distributed or summarized a month later is historic, and not anticompetitive.

*Second*, the information allegedly exchanged here is not the type that courts find to be anticompetitive. Courts assess information exchanges by looking to the nature of the information and the market structure. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). Where a complaint fails to allege that data are presented with enough granularity such that they can be used to "police a secret or tacit conspiracy[,]" the complaint should be dismissed. *In re Loc. TV*

[7] The Complaint's allegations about "real time" only assert that the system tracked tariff-related changes in AHC's own costs and recommendations. (¶ 96 & n.121.) The Complaint does not allege any transmission of any competitor's prices to any store, nor does it identify any store that relied on a rival's Price Level. The notion that stores can predict rivals' prices from a webpage listing Price Zones and Price Levels does not demonstrate an anticompetitive exchange. (¶¶ 99–103.)

*Advert. Antitrust Litig.*, 2022 WL 3716202, at *6. This is true even with pricing software that suggests "pricing targets," provides "weekly rate cards" and "bottom prices." *Id.* at *7–8.

*Third*, the data is public. The price data allegedly contained in the Epicor point-of-sale system, Mango Report, "hotsheets," and "Critical Price Change" alerts is shelf-price data. Any Ace store owner could simply drive "15 minutes" to other stores and see prices on the shelves (or could look online) to know exactly what those competitor stores were charging at that moment.

*Fourth*, there is no allegation that any data allegedly shared among Ace stores identified which store offered each price. Such information would be necessary to police any supposed conspiracy; if co-conspirators cannot identify those "cheating" on the conspiracy, they cannot police that conspiracy. *See In re Turkey Antitrust Litig.*, 2026 WL 1960792, at *25–27 (allegation that defendants *could* deanonymize data, without allegations that defendants *did*, was insufficient).

## V. The Alleged Agreements Are Lawful Under the Rule of Reason (Causes of Action I, II, III)

The Sherman Act prohibits only unreasonable restraints of trade, and "typically only horizontal restraints—restraints imposed by agreement between competitors—qualify as unreasonable *per se*." *Am. Express Co.*, 585 U.S. at 540–41 (cleaned up). "Vertical restraints—agreements between parties at different levels of the market structure, such as manufacturers and distributors—have more redeeming qualities (e.g., allowing for distribution efficiencies) and are subject to the rule of reason." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272 (6th Cir. 2014) (cleaned up). The Rule of Reason also applies to restraints that have both vertical and horizontal components. *Id.* (applying Rule of Reason where dairy cooperative and milk processor allegedly competed but "substantial vertical elements were too significant" to be horizontal). The Rule of Reason is the "standard framework for analyzing an action's anticompetitive effects on a market[.]" *Agnew*, 683 F.3d at 335.

All of the alleged agreements in the Complaint should be evaluated under the Rule of Reason. The Rule of Reason is the presumptive standard. *Id*. The nature of this Complaint leaves no doubt that this is a Rule of Reason case. *First*, the Complaint labels Count I a *per se* horizontal price fixing claim. (¶ 216.) But "defendants' alleged activity must be scrutinized to determine whether such characterization is appropriate." *Car Carriers, Inc.*, 745 F.2d at 1108. The Complaint alleges that AHC collected and distributed price data, issued price alerts directing Ace stores to raise prices, recommended localized prices, encouraged stores to follow its recommendations, and supplied the technology for implementation. (¶ 213.) Each alleged action describes a vertical restraint flowing from AHC down to Ace stores, including its over 250 corporate stores. None describes "[a]n agreement between competitors at the same level." *In re Se. Milk Antitrust Litig.*, 739 F.3d at 272. Epicor likewise only has vertical agreements with AHC and Ace stores. (¶ 16.)

*Second*, the so-called "horizontal market allocation" claim is no different. The Complaint claims that AHC "restricts new stores from opening in locations where they would compete on price with existing Ace Member Stores." (¶ 7.) Ace stores supposedly agreed with AHC to seek its approval "before opening a new store location or relocating an existing store." (¶ 37.) But every alleged agreement, including the "Right of First Refusal Agreement" and "Store Development Agreement[s,]" is between AHC and Ace stores (not among Ace stores). (¶¶ 145, 147.) These vertical agreements are likewise subject to the Rule of Reason.

*Third*, information exchange claims are also evaluated under the Rule of Reason. *In re Manufactured Home*, 2025 WL 3485693, at *14 (citing *U.S. Gypsum*, 438 U.S. at 441 n.16) ("[T]he exchange of price data and other information among competitors does not invariably have anticompetitive effects" and therefore "do[es] not constitute a *per se* violation of the Sherman

Act"); *see also United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975); *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *3 ("[e]xchange of information is not illegal *per se* but can be found unlawful under a rule of reason analysis, which considers 'a number of factors including most prominently the structure of the industry involved and the nature of the information exchanged'").

As demonstrated in Part III above, the Complaint fails to plead a plausible product or geographic market. That failure applies whether *per se* or Rule of Reason treatment applies. The Complaint also fails to include plausible allegations of market power or anticompetitive effects, which are essential to claims subject to the Rule of Reason.

### A. The Complaint Does Not Plausibly Plead Market Power

"Substantial market power is an indispensable ingredient of every claim under the full Rule of Reason." *Chicago Pro Sports LP*, 95 F.3d at 600. "Market power is the ability to raise price profitably by restricting output." *Am. Express Co.*, 585 U.S. at 549. A defendant has market power when it "can produce anticompetitive effects" in a relevant market, *Agnew*, 683 F.3d at 337, or when its share of the relevant market "exceeds whatever threshold is important" in the industry. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000). But, as explained above, the market must "correspond to the commercial realities of the industry." *Sharif Pharmacy*, 950 F.3d at 917.

The Complaint fails both the direct anticompetitive effects and the market share analysis. As for direct effects, the Complaint alleges that Ace was able to "implement steady price increases" at its own stores through its anticompetitive scheme. (¶¶ 69–71, 157.) It does not allege that the scheme caused prices to increase at any other hardware retailer, whether small or large. If that were the case, customers would be free to shop elsewhere to escape the effect: "It defies belief to suggest that a hypothetical monopolist retail pharmacy could raise its drug prices substantially without losing customers to competitors outside that tiny area." *Sharif Pharmacy*, 950 F.3d at 917.

As for market share, the Complaint lists various high percentages of "market share" in the "local trade area," "Price Zone," and MSA geographic markets. (*See, e.g.*, ¶ 10 ("100% of their local market")); ¶ 115 ("estimated 66% (4 of 6) of the convenience hardware stores within this 15-minute driving radius"); ¶ 174 ("approximately 83% of convenience hardware stores in the local markets"); ¶ 194 ("over 60%, and often 100%, of local relevant markets for convenience hardware")). But this is only because Plaintiffs have inappropriately gerrymandered the "local market" to include only convenience hardware stores, when there are obvious substitutes available. *See Sharif Pharmacy*, 950 F.3d at 916 ("A relevant market under the Sherman Act is comprised of the commodities reasonably interchangeable by consumers for the same purposes") (cleaned up).

The Complaint fares no better in its threadbare allegations of market power in the "Price Zone" markets, where again the relevant market excludes obvious competitors such as Home Depot. (¶ 185.) The MSA-level allegations wrongly exclude obvious competitors from its analysis of the one proposed MSA market it includes (despite there being hundreds of MSAs nationally) (¶ 187) and throwing in random allegations of power in geographic markets it has not proposed like North Seattle (¶ 153). The Complaint makes a last-ditch effort in alleging nationwide market power. (¶ 183.) But again, it fatally excludes other competitors. (¶¶ 190, 194.) Had the Complaint properly included all of Ace's actual competitors (even just the obvious ones), Ace's market share would be well below any notion of market power.

### B. The Complaint Does Not Plausibly Allege Anticompetitive Effects

"[P]laintiffs must allege that the anticompetitive conduct at issue actually impacted competition in a relevant market." *United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 924 (N.D. Ill. 2015). "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less,

competitive." *U.S. Gypsum*, 438 U.S. at 441 n.16. Mere "formulaic recitation" or "conclusory" labels cannot save the Complaint, *Iqbal*, 556 U.S. at 681; simply calling prices "higher" or "supracompetitive" is conclusory, not fact-based, and insufficient. The Complaint must but does not plead *facts* plausibly suggesting that the alleged agreements caused anticompetitive effects in the alleged relevant markets through either direct, or indirect evidence.

**1. There is no alleged direct evidence of anticompetitive effects.**

Direct evidence of anticompetitive effects is proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality. *Am. Express Co.*, 585 U.S. at 542. The Complaint offers boilerplate language that the conduct "has substantial anticompetitive effects, including increased prices and reduced output," without any allegation of what the specific effects were or that those effects occurred in the relevant market. (¶¶ 219, 230.) These are precisely the type of "naked assertions devoid of further factual enhancement" that *Iqbal* disallows. *Iqbal*, 556 U.S. at 678 (cleaned up).

The assertions about increased prices fare no better. Despite acknowledging that Ace stores carry "thousands of individual items" (¶ 189), the Complaint cherry-picks a mere handful and presents them as evidence of a wide scheme to increase prices above competitive levels. (¶¶ 71, 111–118, 157.) And the Complaint alleges that prices increased *only at Ace stores*. (*Id.*) It is not an antitrust violation to raise prices or charge more than a competitor. *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 50 (7th Cir. 1992) ("individual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do *not* constitute an unlawful agreement") (cleaned up). In any event, merely pointing to higher prices is insufficient because higher prices can be "fully consistent with a free, competitive market." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012).

The absence of a plausibly pleaded direct detrimental effect on competition makes sense

in this particular case because "[w]holesale purchasing cooperatives [] are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 295 (1985). Cooperatives "enable smaller retailers to … compete more effectively with larger retailers." *Id.* The alleged restraints are not "naked" with "no purpose except stifling competition." *Palmer*, 498 U.S. at 49. At most, they are ancillary to a procompetitive structure.[8] As the Complaint concedes, the cooperative pro-competitively pools purchasing power, supports national advertising, provides distribution and technology, and helps locally owned stores compete against interbrand rivals. (¶¶ 49–52.) AHC provides Ace stores "the ability to purchase wholesale products at lower prices." (¶ 8.) Ace stores benefit from the cooperative "in all aspects of managing their business, including new store development, customer service, recommended pricing, inventory management, finance and insurance, [and] labor scheduling and marketing." (Ex. A, 2025 Report at 9.) The alleged intrabrand restraints thus "enhance the overall efficiency and profitability of [Ace] Retailers' business" and enable interbrand competition. *Id.* They promote, rather than suppress, competition.

**2. There is no alleged indirect evidence of anticompetitive effects.**

Nor can the Complaint fall back on indirect evidence of anticompetitive effects. This requires a showing of market power, plus some additional evidence that the challenged restraint

[8] Restraints are "ancillary" and governed by the Rule of Reason if they "promote[] enterprise and productivity" as "part of a larger endeavor whose success they promote." *Polk Bros.*, 776 F.2d at 188–89. "[T]he court must apply the Rule of Reason to [ancillary restraints] to make a more discriminating assessment," even if the restraint is horizontal or might be deemed *per se* illegal in other contexts. *Id.* at 186. This is consistent with "the antitrust laws' primary purpose … to protect interbrand competition." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 878 (2007) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 4 (1997)). Ace's store site selection processes as pleaded are vertical intrabrand restrictions and at most ancillary to a legitimate and procompetitive venture that enhances interbrand competition. Ace's practices for reviewing and approving the location of Ace stores are not naked market division. They instead effectively manage store density among nonexclusive retail members to enhance interbrand competition.

harms competition. *Am. Express Co.*, 585 U.S. at 542. The main and insufficient allegation here is that Ace stores increased profits and charged higher prices. (¶¶ 157–159.) The Complaint simply declares that the "increase in gross margin combined with rising gross profits (and sales) suggests that these Member Stores were able to implement profitable price increases in their local markets by reducing competition." (¶ 159.) But the basis for this declaration is nothing more than the fact that Ace stores have been profitable. Nothing suggests that this profitability could only have come from a conspiracy, rather than from rational, ordinary pricing decisions. "If [courts] were to find that Defendants' motive to maximize profits supported an inference of an illegal conspiracy, then all businesses would be subject to antitrust liability." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 321 (6th Cir. 2014); *see also Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 828 (7th Cir. 2019) (where profits did not depend on there being a conspiracy, they could not support an inference of one). The law forecloses "infer[ring] competitive injury from price … data" without showing that "prices were above a competitive level." *Am. Express Co.*, 585 U.S. at 549. The Complaint asks for precisely that type of impermissible inference in the absence of such pricing information.

### C. The Complaint's Alternative "Quick Look" Standard Also Fails

The quick look approach applies only in the narrow class of cases where "no elaborate industry analysis is required to demonstrate the anticompetitive character" of the alleged restraint and "the great likelihood of anticompetitive effects can easily be ascertained." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). It is appropriate only where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* There must be "no countervailing competitive virtues [that] are evident." *NCAA v. Bd. of Regents of U. of Okla.*, 468 U.S. 85, 110 n.42 (1984). These scenarios are not present here for all the reasons stated above.

## **Conclusion**

The Complaint should be dismissed for the reasons set forth above. As this is an amended complaint, dismissal should be with prejudice.

Dated: October 30, 2026

Respectfully submitted,

By: *<u>/s/ John J. Hamill</u>*

John J. Hamill
john.hamill@us.dlapiper.com
Michael S. Pullos
michael.pullos@us.dlapiper.com
Pamela Begaj Loutos
pamela.loutos@us.dlapiper.com
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
T: 312.368.4000

*Counsel for Ace Hardware Corporation, Ace Retail Holdings LLC, Ace Retail Group, Inc., Ace Hardware of Chattanooga, Inc., Bellmore Home Center, Inc. (d/b/a "Costello's Ace Hardware"), Bolster Hardware LLC, The Helpful Hardware Company, LLC, The Helpful Group, LLC, Niemann Foods, Inc., W.E. Aubuchon Co., Inc., and Whitmore Investments, Inc.*

By: *<u>/s/ Gary Feinerman (with consent)</u>*

Gary Feinerman
gary.feinerman@lw.com
Latham & Watkins LLP
330 N Wabash Ave Suite 2800
Chicago, IL 60611
T: 312.876.7700

Lawrence E. Buterman
lawrence.buterman@lw.com
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
T: 212.906.1200

Marguerite Mitchell Sullivan
marguerite.sullivan@lw.com
Latham & Watkins LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004
T: 202.637.2200

Ashley M. Bauer
ashley.bauer@lw.com
Latham & Watkins LLP
505 Montgomery Street Suite 2000
San Francisco, CA 94111
T: 415.391.0600

*Counsel for Epicor Software Corporation*

## CERTIFICATE OF SERVICE

I, Michael S. Pullos, do hereby certify that, on this 30th day of October 2026, I electronically filed a copy of **MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT** using the ECF System for the United States District Court for the Northern District of Illinois. Notice of this filing was served to all counsel of record registered on the ECF system.

*/s/ Michael S. Pullos*
Michael S. Pullos